UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Raymond Sgambati,                          Case No. 16-26430-beh

                        Debtor.            Chapter 7

Patrick S. Layng,

                Plaintiff,

v.                                          Adversary No. 17-2022

Raymond Sgambati,

                Defendant.

**MEMORANDUM DECISION**

This case concerns a pizzeria owner whose troubles bubbled over.  Just when he took a chance on growing his business, he sustained a house and garage fire.  To start his second pizzeria, he had to borrow money, but then encountered equipment failures there and had to borrow more.  He took out what he called "loan shark" loans, repaid in daily increments at high interest. While these issues simmered, a key employee skimmed from the till at both restaurants, further depleting revenue.  Throughout this period, he transferred funds between his business and his personal accounts, and the business paid some of his personal expenses.  The debtor finally retained a lawyer, in hopes of negotiating with his lenders, but alternatively to help him file for bankruptcy.  A month later, finding no room to negotiate, he filed his Chapter 7 case.  The embezzlement scheme came to light five months after he filed for bankruptcy.

The United States Trustee ("UST") seeks to deny the discharge of debtor Raymond J. Sgambati, based on 11 U.S.C. section 727(a)(4)(A), for multiple deficiencies on his bankruptcy schedules: omission of creditors, alleged

misstatement of asset values and expenses, and miscategorization of business debt and income. The debtor admits some errors but denies any fraudulent intent, disputes that the challenged funds are income, and would like to dismiss his Chapter 7 case, with the opportunity to file a Chapter 13 case during which he can manage repayment of tax debt.

After an extensive discovery period, and a two-day trial, the parties submitted post-trial briefing in October, 2017, on both the request to deny discharge and the motion to dismiss. One creditor, Reinhart Food Service, LLC, objected to the motion to dismiss, but the Court ruled it lacked standing. The Court took the matters under advisement.

The Court has reviewed the extensive record in this proceeding, including the exhibits and the audio recordings of the trial testimony. The evidence shows that some of the debtor's criticized conduct weighs in favor of a denial of discharge, while other does not. On balance, however, the scales tip in the UST's direction. For the reasons that follow, the UST is entitled to judgment on his claim under section 727(a)(4)(A). Mr. Sgambati will be denied a discharge and his motion to dismiss will be denied.

This is a core proceeding under 28 U.S.C. section 157(b)(2)(J). The Court has jurisdiction pursuant to 28 U.S.C. section 1334. The following constitutes its findings of fact and conclusions of law.

## FACTS

The debtor, who left school after ninth grade, has operated a New York-style pizza restaurant as an LLC for over 11 years. He was inconsistent in keeping his business and personal records separate, leaving that to his accountant, at month- and year-end. When making purchases, Mr. Sgambati confessed he used "whichever credit card was on top" or offered more flyer miles, regardless of whether it was a business or personal credit card. He routinely transferred funds from his personal account to the business bank account, and less often, from the business to his personal account (other than salary draw). Exs. 21, 22a, 22b, 23, 24b, 24c, 24e, 24f.

The debtor sustained a host of problems in the 18 months leading up to, and shortly after, the filing of this case in June, 2016. The April, 2015, fire at his De Pere home destroyed his garage and caused extensive smoke damage to the home and its contents. Just before the fire, the debtor had decided, prudently or not, to expand his De Pere, Wisconsin pizza business by opening a second pizzeria in Green Bay. He leased the second premises—a former tavern—and much of the equipment, borrowing money to pay for improvements and repairs. Mr. Sgambati testified commercial banks seldom lend to restaurants without substantial equity, and so he did not have a commercial banker guiding him in this expansion. Beside the need for normal improvements like painting at the new site, within the first 60 days at the Green Bay location, the AC unit fell through the ceiling, thirty percent of the tile needed replacement, and the walk-in cooler stopped working. Given the triple-net lease, his landlord declined to repair those items, so the debtor borrowed from online lenders for these repairs. In the first months operating the Green Bay location, Mr. Sgambati had to use revenue from the De Pere restaurant to support it.

By January, 2016, Mr. Sgambati thought the new location was "starting to hold its own." But in early 2016, an employee began siphoning cash from the registers, totaling about $69,000 from both restaurants, or about $230 each day. The debtor did not discover this fraud until November, 2016. He now attributes the loss of embezzled funds to causing him to become delinquent in over $52,000 in taxes and other debt to suppliers, though many of those obligations are post-petition.

In mid-May, 2016, Mr. Sgambati began working with counsel to deal with his creditors and try to avoid bankruptcy. "The wheels were falling off the bus, and I talked to a friend and asked where can I get help . . . . I need someone who can intimidate people that lend people money . . . . They told me to come see you [his attorney], and you would get them to get me a better deal, a better

payment plan than $500 or $600 a day to each creditor."[1] Only when the debtor's online lenders refused to negotiate and "threatened to shut him down using strong-arm tactics" did he decide to file for bankruptcy protection on June 22, 2016. On October 20, 2016, the debtor's Green Bay landlord, Bill Symes, said he received a text message from Mr. Sgambati stating he had closed the second restaurant after a slow summer and a Florida investment that had underperformed.[2] Other facts will be discussed in the course of addressing the parties' arguments.

The UST summarized the allegations of his complaint by listing 16 failures or false statements of the debtor:

1. Failed to list EA Restoration as a creditor;

2. Failed to list Square One Restoration as a creditor;

3. Failed to list Bank of America as a creditor;

4. Failed to report the lawsuit filed by EA Restoration;

5. Falsely reported the EA Restoration debt as a business debt;

6. Falsely reported the Discover card debt as business debt;

7. Failed to accurately report the value of his household goods;

8. Falsely listed alimony payments of $1,116/month on Schedule J;

9. Failed to accurately list his monthly income on Schedule I;

10. Failed to accurately list his personal expenses on Schedule J;

11. Failed to accurately list his annual income in 2015;

12. Failed to accurately list his annual income in 2016;

13. Failed to list $12,000 in convenience check funds on the SOFA;

14. Failed to list $12,000 in transfers to Sgambati's Pizza;

---

[1] The debtor's initial Schedule E/F notes daily payments of $400 on a loan with American Express, and $535 to On Deck Capital, LLC.

[2] The debtor denied having a Florida investment, and nothing in his schedules or the UST's lengthy investigation reflects such an asset. The statement from landlord Symes is included to show that the Court did not accord full credibility to the landlord's testimony on other matters, including number of televisions in the restaurant.

15. Failed to list the transfer of insurance proceeds to Sgambati's Pizza; and

16. Failed to list the transfer or gifting of jewelry valued at $6,750.

The UST also alleged that the debtor made false statements at the meeting of creditors when he testified that his schedules were true and accurate and that he had listed all his income, debt and everyone to whom he owed money.

At trial, the debtor testified that any omissions were honest mistakes due to sloppiness or misunderstandings, without intent to deceive. According to the debtor, when he filed his bankruptcy petition he was trying to avoid the forced closure of his pizza business, given the daily repayment requirements of the online lenders. He testified that he disclosed information to the best of his ability in his initial filings. He provided his lawyers information in paper and electronic form, and answered their questions.

The debtor added a caveat to his initial Schedule I that "many of the personal expenses are intertwined with the business. Car payments are made by the LLC, for example." His original schedule E/F listed his ex-wife as a priority unsecured creditor owed alimony, and twelve nonpriority unsecured creditors, for a total debt of at least $335,567. Shortly after the first meeting of creditors, on August 15, 2016, Mr. Sgambati amended his Schedule E/F to add six nonpriority unsecured creditors, owed debt of at least $91,600. On October 25, 2016, the debtor amended his Schedule E/F a second time, adding $36,372.10 of tax debt to his priority unsecured debt. He also added four more nonpriority unsecured creditors with a total obligation of $31,683.92. This amendment came after the UST had requested a Rule 2004 examination of the debtor and the opportunity to subpoena the debtor's credit card companies. On January 9, 2017, the debtor amended his Schedule E/F a third time, adding three more nonpriority unsecured creditors and $10,000 in debt.

**ANALYSIS**

**A. The UST's Objection to the Debtor's Discharge.**

"The primary benefit of filing for bankruptcy under Chapter 7 is that the financial discharge gives the debtor a 'fresh start.'" *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). The benefit is not unlimited, but is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). The Bankruptcy Code includes several exceptions to discharge.

When a plaintiff seeks to deny discharge pursuant to 11 U.S.C. section 727(a)(4)(A), he or she has the burden to establish, by a preponderance of the evidence, that the debtor made a statement under oath, the statement was false, the debtor knew the statement was false, the debtor made the statement with fraudulent intent, and the statement was related to his bankruptcy case in a material way. *In re Scott*, 172 F.3d 959, 966-67 (7th Cir. 1999). A preponderance of the evidence "is the evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate." *Smith v. United States*, 557 F. Supp. 42, 51 (W.D. Ark. 1982) *aff'd*, 726 F.2d 428 (8th Cir. 1984). If the established facts equally support each party's position, "the judgment must go against the party upon whom rests the burden of proof." *Sherman v. Lawless*, 298 F.2d 899, 902 (8th Cir. 1962).

Denial of discharge is a harsh sanction, and courts construe discharge exceptions strictly in favor of the debtor. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002). Albeit harsh, the primary purpose of a "false oath" discharge exception is to "ensure that dependable information is supplied for those interested in the administration of the bankruptcy estate . . . without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations." *In re Powell*, 580 B.R. 822, 836 (Bankr. E.D. Ark. 2018).

The key issues in this case are whether Mr. Sgambati knew his omissions and inaccuracies were false, and whether those omissions and inaccuracies were supplied with fraudulent intent. Omissions from

bankruptcy schedules and statement of financial affairs constitute a false oath for purposes of section 727(a)(4)(A). *In re Happel*, 394 B.R. 915, 919 (Bankr. E.D. Wis. 2008). The plaintiff must prove the omissions are the fruit of an intent to deceive, or form a pattern of reckless indifference to the truth. *In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014). The intent determination often depends upon the court's assessment of the debtor's credibility. *In re Kempff*, 847 F.3d 444, 449 (7th Cir. 2017). A debtor's honest confusion or lack of understanding may weigh against a finding of fraudulent intent. *In re Hatton*, 204 B.R. 477, 484 (Bankr. E.D. Va. 1997).

In determining whether a debtor's intent is fraudulent, courts should consider the "whole pattern of conduct." *Matter of Reed*, 700 F.2d 986, 991 (5th Cir. 1983); *In re Kindorf*, 105 B.R. 685, 689 (Bankr. M.D. Fla. 1989). Not every single asset needs to be scheduled and valued, but there is a point at which the cumulative errors and omissions cross a line and a debtor's discharge should be denied. *In re Baker*, 205 B.R. 125, 133 (Bankr. N.D. Ill. 1997). Here, the Court considers whether the UST has met his burden to establish intent to deceive, or a pattern of reckless indifference to the truth, by category of omission.

**1. Failure to List Creditors and a Civil Suit.**

The UST asserts the multiple omissions and inaccuracies in Mr. Sgambati's schedules demonstrate a degree of reckless indifference to the truth which the laws view to be intentional, citing *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992). The debtor admits to "sloppy" record-keeping and reporting, but suggests there can be no intent to defraud when there is no motive to do so.

Mr. Sgambati's general argument as to lack of motive is diluted by *In re Kempff*, 847 F.3d at 449, and *In re Katsman*, 771 F.3d at 1050 (explaining that intent to deceive is required, but the particular reason for the deception is irrelevant). Mr. Sgambati also points to his lack of schooling, to support his admitted sloppiness, and some of his assumptions for why certain debts, gifts

or alleged income were omitted.  Courts have cautioned that a lack of education is not, in itself, an excuse for a lack of forthrightness in bankruptcy schedules, *see In re Diodati*, 9 B.R. 804, 808 (Bankr. D. Mass. 1981) (minimal formal education doesn't mitigate the effect of a pattern of reckless and cavalier disregard for the truth), although lack of education, like lack of business sophistication, may help explain a debtor's misapprehension or confusion about certain disclosure requirements.  *Compare In re Hatton,* 204 B.R. at 23 (declining to find mistakes could be excused due to lack of understanding, where debtor was a CPA and sophisticated investor).

### a. Creditors added over three sets of amendments.

The debtor testified to filing this case on an "emergency basis," after hiring bankruptcy counsel a month earlier to negotiate with online creditors in an attempt to preserve both his business locations.  Over the course of three sets of amended schedules, he added 15 creditors, representing at least $169,655 in priority and nonpriority unsecured debt.  The debtor testified that most of the creditors he added later were multi-month billers, or long-term vendor contracts which he didn't realize remained owing after the second restaurant closed, or several which he forgot.  He testified he didn't keep a list of all his bills, and he generally waits to pay bills until their due dates.  He testified ninety percent of his bills are online.  The debtor argues his omissions show no pattern of reckless disregard, let alone a demonstrated intent to defraud.

The case law cautions: "[A debtor] may not excise a false oath, however, by making subsequent corrections to his bankruptcy petition."  *In re Costello*, 299 B.R. 882, 899-900 (Bankr. N.D. Ill. 2003).  This does not mean all amendments are in vain, but that the court still must consider the intent element.  "Allowing a debtor to submit false schedules and then, on discovery, avoid the negative consequence of his dishonesty by amending those schedules is contrary to the spirit of the law which aims to relieve honest debtors only."  *Id.*  A small number of initial omissions may not warrant denial of discharge,

where there is no evidence of intent to defraud, or no pattern of omission. *In re Rosenzweig*, 237 B.R. 453, 457 (Bankr. C.D. Ill. 1999). Here, most of the omissions are reasonably explained, and thereby negate any intent to defraud on this aspect.

In the first amendment, the debtor added an American Express business credit account, with a $74,948 balance. He said he forgot this account, as he already had listed two American Express accounts on his original E/F. He also added Cintas Corp. for $16,373 in business charges, Engels Commercial Appliance, unknown amount, and Van's Fire & Safety, unknown amount, goods and services. Mr. Sgambati testified these accounts had zero balances at the time he filed this case, but when he notified the companies he planned to close the Green Bay store, they insisted he complete their service contracts, and so he listed those debts on his amended schedule. He also listed Wisconsin Media, an advertising bill incurred May, 29, 2016 for $278. He testified he didn't receive the Wisconsin Media bill until after he filed his petition. Last, he added EA Restoration, unknown amount, "judgment for business debt."

In his second amendment, the debtor added priority unsecured claims of the IRS and Wisconsin Department of Revenue, totaling $36,372. Mr. Sgambati testified that he received the tax delinquency notice for May and June in July or August, as his CPA confirmed. The CPA said the two discussed in June that Mr. Sgambati would be late with the May tax payments, which the CPA said was "a first" for the debtor; and the debtor testified "he was a mess" at the time he originally filed. He also added unsecured creditors ASC1, $1,840 for equipment repair and Reinhart Food Service, $23,374 for restaurant supplies. This amendment was filed in October, 2016, around the time the Green Bay site finally ceased operation. In a filing before trial, the debtor conceded the debt to Reinhart actually was $30,697. The debtor also noted that Reinhart was a "good supplier" and he quickly made up the prepetition debt. He testified he thought both ASC1 and Reinhart balances were zero at the time he filed, but because he was cancelling the equipment lease, ASC1

later insisted on full payment. He added Bellevue Water Utility, for $1,469, which billed on only a quarterly cycle, and added a years-old debt that he later recalled to his former restaurant landlord, Bill Schmock, for $5,000.

In his third amended E/F, the debtor added a business loan from Abby Bank, for $3,641, a loan which had been listed originally under the name Fidelity Bank. He also listed interest remaining on a business loan from DirectCapital, amount unknown, something he had forgotten was still owed as he had paid off the principal before filing his case, and a three-year services contract with Martin Systems, Inc., signed in 2015, for $6,800. As with the other services contracts, the Martin balance was zero as of June 22, 2016, but when he moved to cancel the contract, he was assessed the balance.

Considering the whole pattern of conduct related to these added creditors, *see Matter of Reed*, 700 F.2d at 991, it appears the debtor and his counsel were working on two scenarios in the month between mid-May and mid-June: trying to avoid bankruptcy by dealing with lenders and preparing for it as an alternative. After he initially filed, the debtor began winding down the Green Bay restaurant, and was fully operating the De Pere location. His SOFA refers to "extensive prepetition work" by counsel. His initial Schedule A/B notes that he refinanced his home in June, 2016, a process which also requires amassing documentation. Many of the late-added business creditors were zero-balance accounts at the time of filing, or were already listed under another name, and the debtor simply overlooked several other creditors. The Chapter 7 trustee testified that Mr. Sgambati gave her all the information she requested. In sum, the Court finds these particular omissions do not evidence fraudulent intent or a pattern of reckless disregard for the truth.

### b. Creditors omitted despite amendments.

The 15 additions to Schedule E/F discussed above are not the primary focus of the UST's complaint. Instead, the UST focuses more on his allegation that the debtor failed to list, and then wrongfully characterized, the EA Restoration judgment and omitted Bank of America as a creditor and the

Square One Restoration debt. Regarding the omitted creditors, the debtor testified he thought Bank of America already had actual notice of the case, having sent him a letter about it. The debtor's argument for failure to list the Square One debt was that he disputed any amount remained owing, and Square One had stopped sending him bills, did not return phone calls and never placed a lien on his house.

The Court finds, based on the preponderance of the evidence, that the debtor's assumption that his Bank of America ("BOA") debt already was disclosed, was part of a pattern of reckless disregard for the truth. Exhibit 8b, the last statement in the record for Bank of America, shows a zero balance as of June 23, 2015. But Exhibit 24f reflects the debtor wrote a convenience check on a BOA account for $2,000 on May 16, 2016. While Mr. Sgambati may not have received a BOA statement showing that charge before he filed his petition, the debtor should have included that debt. The recency of the cash withdrawal makes the debtor's "forgetting" not credible. His testimony that his receipt of correspondence from BOA within two days of filing his case led him to think BOA had notice, and that he erroneously equated notice with disclosure, misses the mark. The debtor's omission was the failure to disclose the debt in the first place. Correspondence afterward is irrelevant.

As to his failure to ascertain and disclose the status of his outstanding obligation to Square One, the Court finds that omission, based on the preponderance of the evidence, was not part of a pattern of reckless indifference. The Court recognizes that the debtor had paid Square One $34,333 in insurance proceeds between May and June, 2015, and that Square One issued a zero balance invoice as of December 31, 2015. Ex. 20. The debtor's testimony about unanswered phone calls conflicted somewhat with testimony from the Square One office manager, and he agreed he requested upgrade work beyond the fire restoration, totaling approximately $8,000 for which he would be responsible. But he wasn't happy with the work done. The only clear evidence of the debt is a Square One invoice showing a balance due of $8,556.42, after payments by State Farm and Mr. Sgambati in 2015. That

invoice was prepared after the UST filed his complaint in 2017, although the Square One office manager testified that the company sent an invoice in October, 2015, which the debtor denies receiving, and which was not made part of the record. Even accepting that Square One sent an invoice or notice of intent to file lien in October, 2015, the debtor had lodged various complaints about unfinished work, both he and the office manager testified the work remained incomplete, and he then received the December 31, 2015 invoice showing a zero balance. Ex. 20. Mr. Sgambati was entitled to rely on that zero balance at the time he filed his petition.

The third omission is the debtor's failure to disclose the $2,552 EA Restoration debt in his initial schedule. His explanation is insufficient. He disputed owing $2,552 to EA Restoration, even though the company's boarding-up work was part of the insurance claim submitted to State Farm. Exs. 18, 33. The debtor said he never saw the invoice, although the EA Restoration witness testified that the debtor signed the work order on the day of the fire. Mr. Sgambati says he forgot about the debt or thought he didn't owe anything. After mediation failed due to the debtor's non-appearance, EA Restoration converted its small claims suit into a default judgment. Given the extent of collection efforts, the debtor's testimony about forgetting the debt is not credible. The Code requires a full and complete disclosure by a debtor of interests of any kind. *In re Powell,* 580 B.R. at 836. The evidence is that he was aware of the debt, and he should have listed it in his original schedule. The requirements of full disclosure include disclosing debts with which a debtor disagrees.

The debtor did list the EA Restoration default judgment in his first amended schedules. The problem with the amendment, which the debtor now admits, was listing it as a business debt, given that it related to post-fire repair of his home. The debtor attributed that error to poor communication with counsel and careless attention to schedules.

The record is not entirely clear as to whether the debtor's erroneous labeling of the default judgment is primarily counsel error, or was engendered

by his long-standing practice of mixing business and personal expenses and income. A review of CCAP easily could have avoided the labeling error, and so suggests counsel error. While the original mischaracterization is not evidence of fraudulent intent, the failure to correct that error is part of the debtor's pattern of reckless disregard for whether his schedules contained accurate information.[3]

## 2. Alleged False Reporting of Household Goods Value and Business Debt.

Next, the UST asserts that the debtor understated the current value of his household goods by some unspecified amount. As with the other categories of UST claims, the plaintiff has the burden to establish all the "false oath" elements with regard to this assertion, by a preponderance of the evidence. *In re Scott,* 172 F.3d at 966-67.

The UST's argument is primarily one of inference. Mr. Sgambati received $70,985, per Ex. 33, in loss reimbursement from State Farm after his house and garage fire. The debtor admitted he deposited $63,800 in proceeds from State Farm into his business checking account. Ex. 33. There is no dispute he used the business account to pay Square One $33,433 for its restoration services. Once Square One was paid, the UST infers that Mr. Sgambati used the remainder of the State Farm proceeds, minus $2,552 owed EA Restoration, totaling $35,000 (full reimbursement, even if not shown as deposited), to purchase his replacement furniture, clothing and appliances. The UST acknowledges, however, debtor testimony that some of those funds were used to purchase televisions for the Green Bay restaurant. From this evidence, the UST argues that the debtor was deceitful in listing only $5,150 as the value of his household furniture, appliances, and electronics, a year after purchase.

---

[3] When the debtor included the default judgment on Schedule E/F in his first amended schedules, he also should have amended his SOFA to include the EA Restoration claim as a lawsuit in which he was a party in the year before filing. CCAP is the free, on-line system for access to pending and closed Wisconsin state court matters.

The UST did not offer a depreciation schedule, any appraisal of the goods, photographs, or other documentation.

Against that inference, the invoices of record show $21,941 in furniture, appliances and electronics purchases in July and August, 2015, from Younkers and HH Gregg. Exs. 6, 7c. Some or all of the televisions reflected in the HH Gregg invoice were bought for the Green Bay restaurant, according to the debtor's trial testimony, which was not wholly clear or consistent with his landlord's testimony. Mr. Sgambati testified he purchased an Acer computer for his daughter from Wal-Mart, and his credit card records show a $400 purchase from that store in the months after the fire. Ex. 7c. Mr. Sgambati boasted that the insurance reimbursement covered only "80% of what he spent" on household replacement items, enumerating multiple items for each floor of the house. He also testified that he put a portion of the insurance proceeds into his business, because "the restaurant needed the money," which is another indication he spent less than $35,000 for replacement household goods. The Square One invoices show that some household items were not discarded, at least initially, but were cleaned of smoke damage. Ex. 20. Despite extended discovery, there are no invoices or credit card statements showing that the debtor spent measurably more than the $22,300 spent at Younkers, HH Gregg and Wal-Mart, and he may have spent much less on household goods, if some of the HH Gregg televisions are excluded.[4] Mr. Sgambati testified he used some State Farm proceeds to replace items in his garage, such as a compressor, tools and pool equipment. None of these items are listed on Schedule A/B, but this testimony also may account for some of the spent proceeds. *In re Baker,* 205 B.R. at 133 (noting not every single asset must be scheduled and valued). In any event, the debtor testified, without objection, about depreciation based on conversations he had with his insurance company ("they have some sort of depreciation schedule and . . . this

---

[4] The debtor's 2015 tax returns reported the $7,005 and $3,917 amounts on the HH Gregg invoices as spent on "GB TVs." Ex. 6.

is what I bought it for and it was three years old, so this is what it's worth and that's what you get. So a TV that was worth you know $5,000 is worth a nickel basically.").

Courts accept that household goods depreciate considerably, likely due to their daily use and original mark-up. *See, e.g., In re Noland*, 13 B.R. 766, 771 (Bankr. D. Kan. 1981) (explaining the difficulty in building equity in household goods and furniture "because they depreciate so rapidly"); *In re Bishop*, 420 B.R. 841, 855 (Bankr. N.D. Ala. 2009) (agreeing that value attributed to household goods would have depreciated significantly in three years between a statement of financial condition given to a bank and preparation of the debtor's bankruptcy petition); *see also In re Blanchard,* 201 B.R. 108, 129-30 (Bankr. E.D. Pa. 1996) (explaining that, while single valuable pieces of household furnishings, as well as jewelry and other liquid assets, should be listed at fair market value, liquidation valuation may well be appropriate for general household goods).

The party with the burden of proof, the UST, has put forward no evidence on the rate of depreciation of televisions, computers, or furniture as reflected in the HH Gregg, Younkers and Wal-Mart invoices, for a household used by the debtor and his teenage daughter and others.[5] The record is unclear as to how many of the televisions purchased from HH Gregg went to the business instead of the household, and landlord Symes' testimony about the televisions conflicts with the debtor's. The record also is unclear as to how much of the State Farm proceeds the debtor kept for business use, foregoing some home repair or goods replacement, in a period when his business was under financial duress, or how much he used for replacement items like the tools and a compressor which he forgot to schedule entirely. Viewing all the facts strictly in favor of the debtor, *In re Kontrick*, 295 F.3d at 736, the $5,150 value ascribed by the debtor on Schedule A/B roughly corresponds with what he testified the

_____

[5] The debtor's girlfriend and her two children also stay at his De Pere home, "about 60% of the time." His daughter is there 4 to 5 days each week.

insurance representative told him about rates of depreciation. Accordingly, there is not a preponderance of evidence from which the Court could conclude that the $5,150 current value identified by the debtor is intentionally false or part of a pattern of reckless disregard for the truth.

### 3. Lack of Transparent Reporting of the Debtor's Wages and Expenses.

In this category of alleged omissions, the UST criticizes the debtor for not observing "corporate formalities." More specifically, the UST faults the debtor for not including on his Schedule J or SOFA his business creditors, gross monthly business income, business expenses, or those personal expenses the business pays on his behalf. The UST also faults the debtor for not reporting past business revenue on his SOFA. In addition, the UST criticizes the debtor for reporting $3,500 as his monthly income on Schedule I, with "transfers back to the business," while bank statements reflect monthly transfers of approximately $7,200 to 7,800 out of the business account as "rays pay." Exs. 29-32b. The UST challenges the debtor's listing of $1,116 as an alimony expense on Schedule J, when he testified that is one of the expenses his business covers. The UST tallied Mr. Sgambati's personal expenses paid by the business—including car payments, alimony and credit card charges—for an average monthly benefit in the year before filing, of $11,676. Exs. 29-33b. Related to those payments, the UST also points to differences between what the debtor reported as gross income on his 2015 and 2016 tax returns, compared to figures he reported on his SOFA.

In response, the debtor cites testimony from his CPA, Jon Brunette, and the UST's auditor, Vince Morelli, that single-member LLCs are "disregarded entities," and as such all personal and business expenses and income are included on one tax return. The debtor testified he relied on his accountant to clear things up after the end of each month for tax reporting purposes. The CPA confirmed that he segregated the business income and expenses by reviewing bank statements and discussing with the debtor. In light of his combined tax reporting, the debtor argues that alimony paid from the LLC

account does not make a difference to the estate or for a return to creditors. Finally, his counsel argues that if any look-back period is appropriate for calculating the debtor's income for Schedule I, it should be the six-month period of the means test, and not the twelve or more months the UST critiques.

The debtor's specific arguments are not entirely availing. That a debtor owns a single-member LLC does not relieve him of the burden to present a complete and transparent a picture of his personal finances (separate from the LLC's). Identifying "who pays what" does matter, if the failure to disclose the true source of payment leads to a false impression about the debtor's actual financial position.[6] At the same time, the Court recognizes that small businesses, particularly single-member LLCs run by persons who are not highly educated or sophisticated, may have a habit of commingling personal and business expenses and income. And in certain cases, that pattern of "ordinary course" conduct may be deemed less than optimal but lacking an intent to deceive. *See, e.g., In re Carney*, 558 B.R. at 261-67 (under section 727(a)(2) analysis, finding the debtor's habit of transferring personal funds to his corporation to pay vendors necessary for its continuing operation, was not done with intent to defraud creditors); *In re Varner,* No. 14-6021, 2015 WL 4039390 (Bankr. N.D. Ohio, June 30, 2015) (applying section 727(a)(4)(A), finding sole shareholder of S corporation legitimately confused, and not intending to deceive, when he failed to disclose cash withdrawals from corporation because he already had paid personal income tax on corporate earnings). *Compare In re Hansen,* No. 14-96025, 2018 WL 1587538 (Bankr. N.D. Ill., March 28, 2018) (finding that the debtor, as a highly educated, business-savvy dentist who owned and operated a number of businesses, and performed much of the bookkeeping himself, inexcusably failed to disclose his interest in his restaurant, another dental practice, a limousine and an airplane).

---

[6] Accurate reporting of disposable income on a Chapter 7 Schedule J, for example, allows the UST to consider whether the income reported is high enough to warrant a motion to dismiss or convert to Chapter 13, for the benefit of unsecured creditors. *See* 11 U.S.C. § 707(b)(3).

The UST's chief complaint here is that the debtor's history of mixing business and personal account funds precludes the plain, accurate and transparent disclosures that the Code requires of debtors. *In re Powell*, 580 B.R. at 836 (interested parties should not have to "dig out the true facts in examinations or investigations"); *In re West,* 328 B.R. 736, 748-49 (Bankr. S.D. Ohio 2004) (noting that the investigative burden associated with an omission is reduced, if the trustee can identify errors during normal procedures, such as reviewing information provided at the section 341 meeting).

In particular, the UST asserts that the debtor failed to report business creditors, but the better assessment is that he only partially reported. Indeed, a number of his schedules refer to his business debt: Part 6 of his petition, and his SOFA, state that his debts are primarily business debts. He estimated those liabilities between $500,001 and $1 million. His schedule A/B identifies both a personal checking account and an LLC checking account, and security deposits with both restaurant landlords. He described the interest his LLC has in equipment and supplies, as well as related liens, inventory and weekly store sales. In Schedule D he named one secured creditor of the LLC. A number of the unsecured creditors listed on Schedule E/F are for "business charges" and personal guarantees related to his business. His Schedule G describes a lease for a Toyota Sequoia, "will kep on paying [sic]," which appears to be the car expense he disclosed as paid by the business. His SOFA lists his business name, address and accountant information, and notes he may have given a financial statement about the business to creditors beside Fidelity. These pieces of information about business creditors and disclosure of the business account are akin to the type of notice found sufficient in *Carney*, and, as far as they go, do not reflect an intent to deceive. But they are incomplete.

The UST then points to the debtor's cash withdrawals from the business account. By the Court's math, adding the weekly $1,800 "rays pay" transfers and several other withdrawals he made from the business account between January and June, 2016, results in a total of $61,983. The transfers back in to the business account from Mr. Sgambati total $38,985. Thus the monthly

net to Mr. Sgambati from the business in that six-month time period averages $3,833, more than $300/month above what he reported on Schedule I. Ex. 25. Given the regular $1,800 weekly draws Mr. Sgambati took, there is no real explanation for how he arrived at the $3,500/month number, except by an inattentive guess.

The UST turns to the debtor's designation of the Discover credit card as "business debt" when in fact he charged a number of personal items to the account, and the business checking account paid for other personal expenses. In itself, using a business account to pay personal expenses is not a basis to deny a Chapter 7 debtor his discharge. *In re Bub*, 502 B.R. 345, 359-60 (Bankr. E.D.N.Y. 2013). But falsely underreporting the amount of business funds used for personal expenses will support a claim under section 727(a)(4)(A). *Id.* at 359. In the *Bub* case, the debtor falsely reported that a credit card was used solely for his business expenses. But the evidence showed charges for multiple recurring non-business items like personal grooming, dry cleaning, food and entertainment. In the three months before filing his petition, these covered expenses would have added more than $2,500 to the debtor's monthly income. The debtor did not report those charged expenses as income. He was the sole user of the credit card, and the court concluded that his omission of income was a false statement with intent to deceive his creditors and the court. The court denied his discharge on that basis.

This case is similar to *Bub*. There was no explanation for why the debtor treated the car and the alimony payments differently on his initial schedule, or why he failed to itemize the treatment of other personal expenses in his later amendments. For instance, at trial he testified the business had paid for some personal plane travel, which was not reported on his schedules. A blanket caveat like "many personal expenses are intertwined with the business" does not relieve the debtor from reporting as accurately as he can. *Compare In re* Carney, 558 B.R. at 261 (the debtor failed to list his ownership of corporation in Schedule B and his doing-business trade names on SOFA, but the court

found his references elsewhere to business inventory kept at the corporate location put creditors and the trustee on notice that he operated a bar through a corporate entity). Mr. Sgambati's blanket caveat does not provide the same notice.

Bank records show that in the six months from January through June, 2016, before he filed this case, the LLC paid Mr. Sgambati's ex-wife $5,090, or an average of $848 per month. Ex. 30. That amount is less than the $1,116 noted on Schedule J, but Schedule J is still a false statement because it reports these payments as coming directly from the debtor.

The UST's auditor made some assumptions about what business credit card expenses were personal or business, but Mr. Morelli acknowledged he did not discuss his assumptions with the debtor, and could not dispute with certainty that some purchases, such as items from Menards, were actually used for the business. Other purchases, such as from Victoria's Secret, are undeniably personal. Although Mr. Sgambati used "whichever card was on top" when making credit card purchases, for purposes of his schedules the debtor should have broken down his credit card debt between business and personal amounts. He failed to do so for his initial filing, and failed to make those distinctions in any of his three amendments. He offered no reason why that clarity was not provided.

At this point the determination under section 727(a)(4)(A) comes down to assessing the debtor's intent when he prepared his schedules. *See, e.g., In re Courtney*, 351 B.R. 491, 507 (Bankr. E.D. Tenn. 2006) (finding the debtor's failure to disclose $15,000 in checks written from his company's business account and used to maintain his household, should have been disclosed separately, but the omissions were not done with an intent to deceive). Even when viewing the facts strictly in favor of the debtor, *see In re Kontrick*, 295 F.3d at 736, the preponderance tips toward a finding of a reckless disregard for the truth.

The debtor's CPA dealt with Mr. Sgambati's practice of intertwining personal and business expenses, for tax reporting. But the CPA did not assist

the debtor in preparing his bankruptcy schedules, and those disclosures are designed to give creditors and the trustees accurate information regarding the debtor's sources of income and liabilities. The exercise of completing bankruptcy schedules is not simply a matter of transferring data from tax forms, and even here, the income reported differed significantly. The debtor points to his own disorganization as part of the excuse, compounded by matters outside his control (the fire and the employee embezzlement) which exacerbated his financial strain. But the fire occurred more than one year before the debtor filed this case, so even the temporary displacement from his home did not detract from his ability to review credit card statements and accurately identify which expenses were business or personal. Indeed, he testified he made distinctions like that on a monthly basis to his business accountant. And although the embezzlement was ongoing as of June, 2016, it did not prevent the debtor from taking his case seriously enough to identify and segregate his sources of income. Even when the Court considers the external stresses on the debtor, they are not so great as the complex personal and financial situation facing the debtors of *In re Charleston*, where those colliding circumstances precluded a finding of intent to deceive. *In re Charleston*, No. 16-32113-H5-7, 2018 WL 1174984, at *4 (Bankr. S.D. Tex. Mar. 5, 2018).

Nor did the fire or the embezzlement prevent Mr. Sgambati from amending his schedules to correct the mistakes. He acted in reckless disregard of his duties to honestly disclose, when he did not amend to accurately reflect that the LLC paid alimony to his ex-wife, or to review credit card statements to segregate personal debt from business debt, and to honestly disclose the transfer of the $6,750 engagement ring. The debtor was too passive and inattentive to his duties. Many of the amendments he did make were either because new bills came to his mailbox, or were prompted by trustee inquiries. He should not have relied on the Chapter 7 trustee or the UST to "disentangle" the personal expenses paid by the business.

### 4. Alleged Failures to Accurately List Income.

In this category, the UST asserts that the debtor failed to include as income on his schedules three discrete types of cash or check proceeds received. For authority, the UST relies on the Code's broad definition of "income," including income that is exempt from taxation,[7] and then cites cases which consider whether various types of funds are income for taxation purposes. Based on *In re Carmel*, 134 B.R. 890 (Bankr. D. Ill. 1991), *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426 (1955), and *James v. United States*, 366 U.S. 213 (1961), the UST urges that the debtor had "'accessions to wealth clearly realized' over which he exercised dominion." *Id.* Because each of these instances allegedly put Mr. Sgambati in an improved financial situation, but were not disclosed, the UST urges they constitute cause to deny discharge.

### a. Portion of insurance proceeds.

The first category of allegedly unreported income is $2,552 of the State Farm insurance proceeds. While State Farm sent the debtor checks totaling $70,985 for reimbursement of fire losses, Ex. 22b, including work performed by EA Restoration, Ex. 18, the debtor did not pay EA Restoration $2,552 for its work at his home, later disputing the quality or necessity of EA Restoration's work. The debtor disagrees that the proceeds are income, and further insists that, should the Court conclude they are, he could not have known that before and so could not have intentionally failed to disclose them. The debtor also denies his financial condition was improved by retaining the funds. He points to testimony of the UST's auditor, Mr. Morelli, and the CPA, Mr. Brunette, as supporting this result. Mr. Brunette was asked whether loan proceeds from a fire claim would "show up" on a tax return. He said they would not, as the funds replace something the taxpayer previously owned.

The Court already has addressed these same funds as an undisclosed debt, and the default judgment appears on the debtor's amended schedules.

---

[7] 11 U.S.C. section 101(10A) defines "current monthly income" as "the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the 6-month period ending on- . . . ."

While the debt may be of long-standing, the funds Mr. Sgambati received from State Farm have always been proceeds designated to pay the debt/judgment he presently owes EA Restoration. *See, e.g.*, *In re Nobles*, No. 09-5106, 2010 WL 3260128, at *6 (Bankr. M.D. Ga. August 18, 2010) (addressing a creditor's ordinary course defense, the court noted that the creditor was paid from insurance proceeds "rather than (from) debtor's income or other assets").

### b. Money from daughter.

The UST points to another instance of alleged undisclosed financial enrichment that should have been reported on the SOFA, question 5, as "other income." The debtor's daughter gave him $2,000 of her birthday money[8] as her contribution for purchase of a used car for her. The debtor asserts he disclosed his daughter's cash contribution twice—once on Schedule A/B, line 3.3, and once on his SOFA, line 23, although not as income. (He also listed the contribution and car on Schedule C.) He argues those schedule references should preempt any finding of intent to deceive. At trial, the debtor admitted his daughter gave him cash in May, 2016, that he used his own American Express card and not the cash to buy the car for $5,303, and that his use of the $2,000 cash is not traceable. The debtor testified that "the seller had my credit card a month before my daughter and I picked up the car," to hold the vehicle, because they were making a family trip out East. The debtor also argues that his financial condition did not improve when he obtained the $2,000, but instead was at least $2,000 worse because he was liable for the credit card debt, and he is not the owner of the car.

The Court finds some of the debtor's testimony about the car purchase conflicts with the language in his SOFA description. The debtor's credit card statement shows a charge for the full $5,303 car purchase from Village Auto in Green Bay on June 18, 2016, four days before filing this case. Ex. 32b. Mr. Sgambati's SOFA entry, particularly its use of the conjunctive "as well as"

---

[8] Mr. Sgambati testified as to various amounts for this birthday cash, between $2,000 and $3,000, and then $2,100 or $2,200. The Court refers to $2,000 for ease of reference.

suggests that the cash never came into his hands: "2001 Toyota Camry - paid $4300 for the car from daughters bank account as well as a contribution from the debtor ($2000)." Case No. 16-26430-beh, CM-ECF, Doc. No. 1, at 40. *See In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) ("intent to defraud involves . . . an omission that you know would create an erroneous impression"). One view of the debtor's SOFA description of the Camry purchase is a design to avoid disclosing that he gained at least $2,000 in cash from his daughter, before charging the purchase and filing his bankruptcy case. But another view is that the SOFA describes what the debtor intended as of the date his daughter gave him her birthday money, and what he continued to intend up to the point of the car purchase, and that the timing of the actual purchase/charge was influenced by the family trip out East. The latter view also corresponds with the Schedule A/B statement that the car is in the debtor's name only for insurance purposes; it really belongs to his daughter. Accordingly, the preponderance of the evidence on intent does not tip in favor of finding an intent to defraud or reckless disregard for the truth on this point. Even if the Court were to conclude the $2,000 birthday money was "income," by noting receipt of the funds at three places on his schedules, the debtor did not fail to disclose it. *See, e.g., In re Carney*, 558 B.R. at 261-67 (failure to list ownership of corporation on SOFA, but disclosure of corporation inventory elsewhere on schedules, was sufficient notice).

### c. Convenience checks.

The third category of undisclosed income as alleged by the UST, is the $12,000 in cash the debtor obtained by use of convenience or cash advance checks. *See* Ex. 24f, at 46. The debtor deposited the checks into the business bank account. The UST asserts that while normally convenience check funds are considered loans, with a corresponding obligation to repay, the facts here reflect a lack of intent to repay, and thus the funds merely improved debtor's financial position at a time of dire personal and business financial straits.

The debtor admits writing checks to "Sgambati's NY Pizza" and "Ray & Sgambati's NY Pizza" on three separate credit card accounts.[9]  Each check was written and deposited on May 16, 2016, one month before he filed his bankruptcy case.  But the debtor insists the convenience checks retained their character as loans.  He cites *In re Almonte*, 397 B.R. 659, 667 (Bankr. E.D. N.Y. 2008), which held that cash advances are not included in projected disposable income.  *Almonte* did not fully answer whether cash advances remain loans when the question is lack of intent to repay.  The debtor also distinguishes *In re Carmel*, 134 B.R. 890, contending that the sham loan there was an effort to lower tax debt.  Here, the debtor argues that the loans were not "shams," but that he remained liable to the credit card companies, at high interest rates.  He testified that he had hired a lawyer in hopes of negotiating with his creditors, to avoid filing bankruptcy: "I need[ed] someone who can intimidate people that lend people money. . . . They told me to come see you, and you would get them to get me a better deal, a better payment plan than $500 or $600 a day to each creditor."

A number of courts generally agree with the debtor's position that these advances are loans and not income.  *See, e.g., In re Murphy*, 190 B.R. 327, 332 (Bankr. N.D. Ill. 1995) (denying a creditor's request for a determination of nondischargeability under section 523(a)(2)(A)):

> Any credit transaction involves a promise to pay.  A credit card transaction is no different merely because the party extending the credit is not present to receive the promise.  The presentment of a credit card, the signing of a charge slip or other express acknowledgement of the obligation and the receipt of value in exchange are enough to constitute such a promise.

The use of a credit card is a representation regarding future action.  Such a representation is fraudulent only if the maker does not have the subjective intent to perform the action.  *Id.*

---

[9]  Mr. Sgambati wrote the checks from his personal credit card accounts at Discover, Sears and Bank of America.

To make that determination, the court should consider all the circumstances. As of mid-May, 2016, Mr. Sgambati was paying online lenders $935 to $1,200 daily via "sweeps" from his accounts, his business was suffering from hidden employee skimming, and he struggled to operate the Green Bay location. He refinanced his house. He met twice with a bankruptcy lawyer in hopes of negotiating with his creditors. He made one $220.32 payment on May 31, 2016 to his Discover card. Ex. 10b. He made a $130.00 payment to his Sears card, logged on July 1, 2016. Ex. 15b. Somewhat like the debtor in *Murphy*, who had years of history of paying his credit card debts from his gambling winnings, Mr. Sgambati has a "track record" of borrowing funds and transferring balances, large and small, to try to stanch his loss of cash flow and keep his restaurants running. In mid-May, 2016, since he had already borrowed heavily from his De Pere landlord, the debtor seemed to be grasping at other possible sources of cash, taking from Peter (the convenience checks) to pay Paul (the daily demands of online lenders).

The Court concludes that the preponderance of the evidence shows that, as of May 16, 2016, the debtor had an intent to repay the credit card debt arising from the convenience checks. He wrote those checks at the same time, or just before, he retained counsel to help negotiate with his lenders. He made the minimum required payment on one of the credit card accounts later that month, and on another several weeks later. He didn't know there was on-going embezzlement, and, at least at that point, he still had hopes for a better summer season with the Green Bay location. He had a history of transferring loan balances, to try to get "a better deal." He testified that he planned to avoid bankruptcy, until, in mid-June, his "lenders forced his hand and wouldn't negotiate." The Court finds this testimony credible. The preponderance of the evidence shows that the debtor intended the convenience checks to be loans. The check funds need not have been disclosed as "income."

**5. Alleged Failure to List Transfers.**

Finally, the UST asserts that the debtor should have disclosed the following as transfers: $12,000 in convenience check funds and the $63,800 of insurance proceeds to his business, and his gift of an engagement ring valued at $6,750.  The UST has criticized some of these assets on other bases already.

The debtor testified that he regularly transferred money between his business and personal accounts as "ordinary course," and his CPA agreed.  The UST argues that the debtor's schedules do not disclose that practice.  The UST asserts the business account benefitted by the deposit of $12,000 in credit card funds at the same time the debtor hoped to classify those funds as dischargeable personal debt.  Ex. 33.  Over time, the debtor transferred a total of $63,800 of State Farm funds from his personal account into his business account, Ex. 33, but did not disclose the transfers on his schedules.  The debtor explained that "the business needed the money."  He claimed $33,433 of "GB Improvements" on his business depreciation schedules, Ex. 6, and thereby claimed losses and expense associated with the house fire as business losses or depreciation on his 2015 tax return (an error his CPA said could by rectified by amendment).  At least half of the insurance proceeds were not used for the business; instead he paid Square One $28,433.25 and then $5,000 from the business account, for work on his home.  The debtor admitted it was error to have deposited the insurance proceeds into his business account, an error he said he later rectified by paying Square One from that account, and that he didn't have personal checks at the time.

The debtor asserts that it was reasonable for him to answer "No" to Question 18 of the SOFA,[10] and he points to the UST's auditor's testimony that it is common practice for small business owners to transfer money to their business.  He also cites several cases.  Bankruptcy courts take a close look to consider whether the undisclosed transfer of funds between a debtor's personal

---

[10] "18. Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?"

account and corporations controlled by the debtor is part of the ordinary course of business. *Stamat v. Neary*, 635 F.3d at 981, citing *In re Phillips*, 418 B.R. 445, 462-63 (Bankr. M.D. Fla. 2009) ("The plaintiff established at trial the existence of numerous substantial transfers between the debtor and various corporations controlled by the Debtor within the two years prior to the filing. . . . [W]hile there is insufficient evidence to establish fraudulent transfer for purposes of denial of discharge under § 727(a)(2)(A), it was clearly established that there were transfers of the Debtor's interests outside the ordinary course of business."). *See also In re Carney*, 558 B.R. at 261-67 (finding that the debtor's interests in the corporation and other key information about it were disclosed in other portions of his schedules and at meeting of creditors, such that it was not false to omit amount of personal funds he transferred to the corporation in ordinary course of business).[11]

The Court declines to resolve the UST's argument as to transfer of "income" from the convenience checks and the State Farm reimbursements, to the business account, as it already has addressed these same funds. The convenience check funds represent debt, not business income. Mr. Sgambati acknowledged he was wrong to deposit the State Farm proceeds in the business account, but the exhibits and his testimony show he used the majority of the funds to pay the fire restoration contractor, or buy replacement home furnishings. He admitted he may have kept some money in the business, but for whatever that remainder is, the Court is satisfied it fits Mr. Sgambati's historical habit and "ordinary course" as recognized in the case law, and his understanding of what was permissible, based upon conversations

---

[11] The debtor also cites the discussion in 3-363 *Collier on Bankruptcy*, ¶ 363.03[1] (16th ed. 2015) to support his view that the transactions back and forth between accounts were not transfers to be disclosed in answer to SOFA No. 18 because they were "in the ordinary course" for his business. But all of the cases discussed in the *Collier* segment apply 11 U.S.C. § 363(c), and deal exclusively with whether certain *post-petition* conduct is authorized. *See, e.g., In re Dant & Russell, Inc.,* 853 F.2d 700 (9th Cir. 1988) (post-petition lease); *Johnston v. First Street Cos., Inc.* 56 B.R. 31 (Bankr. D. Minn. 1985) (post-petition indemnity agreement); *In re Roth Am., Inc.,* 975 F.2d 949 (3d Cir. 1992) (post-petition extension of collective bargaining agreement), and so on. Those cases are less relevant when considering adequacy of disclosure of pre-petition conduct.

with his accountant. *See, e.g., In re Carney*, 558 B.R. at 261-67; *Stamat,* 635 F.3d at 981. These two alleged "transfers to an insider" do not establish a separate basis for denial of discharge under section 727(a)(4)(A).

The UST also disputes the debtor's inclusion of the $6,750 engagement ring he bought with his Discover card, four months before he filed this case, as "business debt." He did not disclose the gift itself on his SOFA, but listed his full $11,281 Discover card balance as business debt. Ex. 10b. The UST's auditor was unable to distinguish all items of expense on the Discover card balance, beside the ring, as being business or personal.

The debtor explains his failure to disclose the purchase or transfer of the engagement ring as an honest mistake of forgetting. Alternatively, he argues that the ring was only a conditional gift, *see Brown v. Thomas*, 127 Wis. 2d 318, 327, 379 N.W.2d 868 (Ct. App. 1985), *abrogation on other grounds, Koestler v. Pollard*, 162 Wis. 2d 797 (1991), and that if disclosed he could have exempted it. He cites Wis. Stat. § 815.18(10), "a conveyance or transfer of wholly exempt property shall not be considered a fraudulent conveyance or transfer."

The debtor's statutory citation is not determinative. Indeed, it is only partial, as the debtor's brief omits the remainder of the statute which explains "any or all of the exemptions granted by this section may be denied if, in the discretion of the court having jurisdiction, the debtor procured, concealed or transferred assets with the intent of defrauding creditors." In other words, exempting a late-disclosed item of property would not preclude a section 727(a)(4)(A) analysis. *See, In re Freese*, No. 09-9140, 2011 WL 2604750 (Bankr. N.D. Iowa, June 20, 2011) (whether or not transferred property would be exempt is irrelevant to whether the debtor ought to have disclosed it on his schedules); *In re Katsman*, 771 F.3d at 1050-51 (declining to accept immateriality argument regarding failure to disclose debts owed to family and friends because they would be discharged anyway).

A failure to review credit card statements before preparing bankruptcy schedules which results in a single omission can be excusable. *In re Rosenzweig*, 237 B.R. 453, 457 (Bankr. C.D. Ill. 1999). Even multiple errors do not mandate the finding of a false oath, without sufficient evidence of a fraudulent intent or reckless disregard. *See, e.g., In re Pratt*, 411 F.3d 561, 567-71 (5th Cir. 2005). Mr. Sgambati had a disjointed system of record-keeping, based on his dual business locations and his general reliance on his CPA for business reporting, but on whom he did not rely for his bankruptcy filings. But that does not excuse his failure to disclose the engagement ring. And that omission is another error that makes up a pattern of reckless disregard for the truth.

For the reasons stated above, the Court concludes that the UST has met his burden of proving by a preponderance of the evidence that Mr. Sgambati acted with reckless disregard in failing to disclose all income derived from his business, failing to segregate business from personal expenses on his credit card, failing to list the EA Restoration debt, and failing to disclose the gift or transfer of the $6,750 engagement ring. The Court therefore will grant the UST's motion to deny the debtor a discharge under 11 U.S.C. section 727(a)(4)(A).

## B. The Debtor's Motion to Dismiss.

Mr. Sgambati has moved to dismiss his case, so that he can refile a Chapter 13 and pay his substantial post-petition tax liabilities through a confirmed chapter 13 plan. A Chapter 7 debtor does not have an absolute right to dismiss his case. A motion to dismiss voluntarily is governed by 11 U.S.C. section 707(a), which allows a court to dismiss a case for "cause." The decision of whether to grant a motion to dismiss a bankruptcy case lies within the discretion of the bankruptcy court. *In re Hopper*, 404 B.R. 302, 307 (Bankr. N.D. Ill. 2009) (citing *Peterson v. Atlas Supply Corp. (In re Atlas Supply Corp.),* 857 F.2d 1061, 1063 (5th Cir.1988)).

The debtor bears the burden of demonstrating cause for voluntary dismissal. *In re Hopper*, 404 B.R. at 307. Even if cause is shown, however, courts generally refuse to dismiss a case if doing so would result in prejudice to creditors. *Id.*; *In re Turpen*, 244 B.R. 431, 434 (B.A.P. 8th Cir. 2000). One factor that courts generally consider when ruling on a debtor's motion to dismiss is whether an objection to discharge is pending. *Id.* at 434.

Because the Court has concluded that denial of the debtor's discharge is warranted, and for the same reasons the Court reached that conclusion, the Court finds that the debtor's motion to voluntarily dismiss this case should be denied.

The court will enter separate orders consistent with this decision.

Dated: April 20, 2018

By the Court:

Beth E. Hanan
United States Bankruptcy Judge